1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ROSS WILLIAMS,                        No.  1:15-cv-00416-DAD-EPG

12              Plaintiff,

13        v.                               ORDER GRANTING JUDGMENT IN
                                           FAVOR OF DEFENDANT
14   STANDARD INSURANCE COMPANY,
                                           (Doc. Nos. 25, 26)
15              Defendant.

16

17        This is an Employee Retirement Insurance Security Act ("ERISA") case, brought plaintiff

18   Ross Williams under 29 U.S.C. § 1001 *et seq.*, and filed in this court on March 16, 2015.  (Doc.

19   No. 1.)  Plaintiff challenges the denial of disability benefits by defendant Standard Insurance

20   Company.  The court has reviewed the record and considered the parties' briefing and oral

21   arguments.  For the reasons explained below, the court concludes that defendant's termination of

22   benefits to plaintiff to be supported by the record.

23                                    **INTRODUCTION**

24        Plaintiff Ross Williams was employed as an Overnight Driver by Rent-A-Center.  He was

25   covered under the Rent-A-Center Group a Long Term Disability Plan ("Plan") disability policy

26   administered by Standard Insurance Company ("Standard").  While working for Rent-A-Center in

27   January of 2012, plaintiff Williams fell, injured his back and thereafter applied for long term

28   disability benefits.   Standard determined that plaintiff Williams suffered from lumbar and

                                            1

cervical disease and that he could not perform the duties of an Overnight Driver. Accordingly, in July of 2012 Standard approved plaintiff's claim based upon its finding that he met the Plan's test of disability under the "own occupation" standard set out in the Plan. However, Standard also determined thereafter that plaintiff's back injuries were subject to the "Other Limited Conditions" of the Plan, thereby limiting his benefits to a maximum of twenty-four months. Defendant Standard concluded that plaintiff Williams had not provided objective evidence proving that an exception to this provision of the Plan applied in his case and could not establish that he was unable to work at any occupation. Based upon that determination, in June of 2014 Standard informed plaintiff Williams that they would be terminating his benefits at the end of the twenty-four month period in July of 2014. Plaintiff Williams' benefits were then terminated as of July 16, 2014. Plaintiff appealed this decision and in October of 2014 Standard denied his appeal. Plaintiff initiated this action challenging Standard's decision on March 16, 2015.[1]

## STANDARD OF REVIEW

At the outset, the court must address the appropriate standard review to be employed in reviewing the plan administrator's decision to terminate and deny future benefits. Defendant argues that the administrator's decision is to be reviewed for abuse of discretion because the long term disability policy grants discretionary authority to defendant and provides for a single, four-year term beginning January 1, 2010. Plaintiff argues that the administrator's decision is subject to *de novo* review by this court because California Insurance Code § 10110.6 makes void and unenforceable discretionary language in an insurance policy like the one at issue here.

Section 10110.6, which became effective on January 1, 2012, provides in relevant part:

> If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.

---

[1] ERISA authorizes a participant in an employee benefit plan to bring a civil action to recover benefits due under the terms of that plan. 29 U.S.C. § 1132(a)(1)(B).

Cal. Ins. Code § 10110.6. The statute defines "renewed" as "continued in force on or after the policy's anniversary date." *Id*. In addition, the statute defines discretionary authority as "a policy provision that has the effect of conferring discretion on an insurer . . . to determine entitlement to benefits or that, in turn, could lead to a deferential standard of review by any reviewing court." *Id*.

Thus, pursuant to § 10110.6, an insurance policy that is "continued in force on or after the policy's anniversary date" is therefore renewed under the terms of the statute. A renewal of an insurance policy is significant because "[t]he law in effect at the time of renewal of a policy governs the policy. . . ." *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 927 (9th Cir. 2012). "Each renewal incorporates any changes in the law that occurred prior to the renewal." *Id*. Consequently, any relevant changes in the statutory or decisional law in force at the time the insurance policy is renewed "are read into each policy thereunder, and become a part of the contract with full binding effect upon each party." *Id*. By its terms, § 10110.6 applies to any policy or agreement that provides "disability insurance coverage" to "any California resident" regardless of where it was offered, issued, delivered, or renewed. Here, the parties do not dispute that the policy confers discretion on defendant as the policy administrator and that plaintiff is a resident of California. Accordingly, if the policy renewed after § 10110.6 became effective on January 1, 2012 and before the claim accrued, the policy's grant of discretion to defendant would be void. The parties do, however, dispute whether or not the policy renewed and this turns on the meaning of "anniversary date" as that term is used in § 10110.6.

Defendant argues that because § 10110.6 does not contain a statement of retroactivity and because the policy in question has no defined anniversary date, the term "renewed" only applies after the term of the policy expires and a new policy is issued. The "anniversary date" in this case would then be for the four-year term of the policy, i.e., every four years after the effective date of the policy and not every twelve months. If this were the case, the policy's "anniversary date" here would be January 1, 2014. According to this interpretation of § 10110.6, a policy's "anniversary date" may recur at intervals of any length of time, including periods of more than one year. In support of this position, defendant relies upon the decision in *Polnicky v. Liberty*

3

*Life Assur. Co. of Boston*, 999 F. Supp. 2d 1144 (N.D. Cal. 2013).  In that case the employee benefit plan policy explicitly stated that anniversaries "shall occur each January 1st beginning in 2011."  999 F. Supp. 2d at 1148.  The court therefore found that the policy was altered on the policy's anniversary date and § 10110.6 rendered void and unenforceable provisions in the plan attempting to confer discretionary authority to the insurance agency.  *Id*.  Defendant argues that, in contrast, the policy at issue here had no defined anniversary date but rather was for a four-year term that did not automatically renew each year.

Conversely, plaintiff argues that "a policy automatically renews every year on the policy's anniversary date."  (Doc. No. 34, 2:19–20) (quoting *Rapolla v. Waste Management Employee Benefits Plan*, No. 3:13-cv-02860-JST, 2014 WL 2918863, at *6 (N.D. Cal. 2014)).  Thus, plaintiff essentially contends that the policy "anniversary" is the annual recurrence of the policy's effective date of January 1, 2010.  As such, the policy would have renewed on January 1, 2012 — the same date that § 10110.6 became effective.

This same issue was confronted by the court in *Curran v. United of Omaha Life Ins. Co.*, 38 F. Supp. 3d 1184 (S.D. Cal. 2014).  In that case, the policy did not specify an annual "anniversary date," but rather provided for a two-year term ending on January 1, 2013.  38 F. Supp. 3d at 1189.  Just as is the case here, the defendant argued that the "anniversary date" did not mean every twelve months after the policy's effective date, but rather the expiration of the policy's term, regardless of its length.  *Id*.  The court first noted that the term "anniversary date" is not defined in § 10110.6 or in any regulations promulgated pursuant thereto.  *Id*.  The court then acknowledged that when a term in a statute is undefined, it must be construed "in accord with its 'ordinary, contemporary, common meaning.'"  *Id*. at 1189–90 (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).  The court also observed that in determining "the plain meaning of a term undefined by a statute, resort to a dictionary is permissible."  *Id*. at 1190 (quoting *Cleveland v. City of Los Angeles*, 420 F.3d 981, 989 (9th Cir. 2005) (internal quotation marks omitted).  Finally, following a thorough review of various dictionary definitions and available case law, the court in *Curran* concluded that "anniversary date" in this context refers to the annual recurrence of the policy's effective date of

4

January 1, 2012—the same date that § 10110.6 went into effect. *Id.* at 1189–91. That court also

concluded that the policy in effect on the date of the claim denial therefore "included a void and

unenforceable discretionary clause" and that *de novo* review of the decision was therefore

appropriate. *Id.* at 1191-92. The undersigned agrees with the analysis and conclusion reached by

the court in *Curran* and will adopt it here.[2]

Accordingly, the court concludes that the plan administrator's decision to deny plaintiff

benefits is subject to *de novo* review.

**RECORD FOR REVIEW**

In conducting its *de novo* review of the plan administrator's decision, the court must first

determine the admissibility of the following evidence proffered by plaintiff and attached to his

brief from outside of the administrative record: (1) two transcripts of prior deposition testimony

of Dr. John Hart, D.O. given in other cases (Doc. Nos. 25–2, 25–3); (2) two printouts from

freedictionary.com defining the medical terms "impingement" and "nerve root impingement"

(Doc. Nos. 30–3, 30–4); and (3) a printout from healthgrades.com describing the specialty of Dr.

Williams Federal (Doc. No. 30–2). Defendant objects to this evidence on the grounds that it does

not appear in the administrative record.

/////

/////

---

[2] The decision in *Polnicky* does not contradict this conclusion. The anniversary date in *Polnicky* was defined as a yearly occurrence. Here, the policy was issued on January 1, 2010 and remained in effect for a term of four years. Thus, the policy "renewed," pursuant to § 10110.6(b), upon its continuance in force beyond its "anniversary date" of January 1, 2012. Because § 10110.6 went into effect on January 1, 2012, this policy falls within the statute's scope. Indeed, the policy here was amended on January 1, 2012. (Administrative Record (hereinafter "AR") at 923–24, 926–27.) Since there is no dispute that plaintiff's claim accrued after January 1, 2012, the policy in effect therefore included a void and unenforceable discretionary clause. In the absence of a valid discretionary clause, the standard of review for an ERISA claim is *de novo*. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("[W]e hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."); *Standard Ins. Co. v. Morrison*, 584 F.3d 837, 840 (9th Cir. 2009); *see also Gonda v. The Permanente Medical Group, Inc.*, 10 F. Supp. 3d 1091, 1093–36 (N.D. Cal. 2014) (review was *de novo* because § 10110.6, which was not preempted by ERISA, rendered void any grant of discretionary authority to insurer by the Plan).

## A. *Legal Rule*

Although an abuse of discretion standard limits the court's review to the record before the plan administrator, *McKenzie v. General Tel. Co.*, 41 F.3d 1310, 1316 (9th Cir. 1994), this restriction does not necessarily apply where the "circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review." *Kearney v. Standard Insurance Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999) (quoting *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir. 1995)); *see also Quesinberry v. Life. Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993) (en banc) (such extrinsic evidence should be considered "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision.") The Ninth Circuit has advised, however, that "a district court should not take additional evidence merely because someone at a later time comes up with new evidence." *Opeta v. Northwest Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (internal citation and quotation marks omitted). Indeed, "[i]n most cases, only the evidence that was before the plan administrator at the time of determination should be considered." *Id.* (internal citation and quotation marks omitted).

The court in *Quesinberry* described the circumstances under which evidence outside the administrative record could be considered necessary for the required review as follows:

> claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

987 F.2d at 1027; accord *Opeta*, 484 F.3d at 1217; *Micha v. Sun Life Assur. Co. of Canada*, 789 F. Supp. 2d 1248, 1257–58 (S.D. Cal. 2011). In the end, the relevant inquiry is "whether each piece of extrinsic evidence [is] necessary for the district court to conduct an adequate de novo review." *Opeta*, 484 F.3d at 1218.

/////

### B. Analysis

#### (1) Two transcripts from depositions of Dr. John Hart

Plaintiff argues that these two transcripts of depositions given in other cases should be admitted to demonstrate bias on the part of Dr. John Hart, D.O. (Doc. No. 34, 3:12–4:23.) Specifically, plaintiff argues that the depositions indicate: Dr. Hart has worked for defendant a half to a full day a week since 2010 or 2011; he received $60,000 in compensation from defendant in 2014; he has a work cubicle at defendant's offices; he receives "management emails" that are sent to all of defendant's employees; and in both cases in which the depositions were taken, Dr. Hart opined that the claimant was capable of performing sedentary work. (*Id.* at 3:17–25.)

In *Waggener v. UNUM Life Insurance*, 238 F. Supp. 2d 1179 (S.D. Cal. 2002), the court held that if the plaintiff could demonstrate that his insurer was functioning under a conflict of interest, it might be appropriate to allow the plaintiff to introduce evidence outside the record. *Id* at 1185. In *Hall v. UNUM Life Insurance Co.*, 300 F.3d 1197 (10th Cir. 2002), the case upon which the court in *Waggener* relied, the Tenth Circuit concluded that an alleged conflict of interest did not warrant the introduction of extra-record evidence, reasoning that there was no showing of the manner or extent to which the conflict of interest affected the insurer's decision-making process or how the additional evidence would address any shortcomings in the record before the court. *Id.* at 1205–06; *see also Quesinberry*, 987 F.2d at 1027 ("[I]f the evidence is cumulative of what was presented to the plan administrator, or is simply better evidence that the claimant mustered for the claim review, then its admission is not necessary.").

Here, there is nothing to suggest that the transcripts of Dr. Hart's depositions in two other cases are necessary in order for this court to adequately conduct its *de novo* review of the plan administrator's decision. Plaintiff has not pointed to anything contradictory between Dr. Hart's prior testimony and his report that appears in the administrative record in this case. Plaintiff has also not shown how the extrinsic evidence would address any shortcomings in the record before the court. Indeed, the record in this case already reflects that Dr. Hart is an independent contractor paid an hourly rate by defendant and that he has a "continued professional relationship

with Standard." (AR at 24.) Therefore, the deposition transcripts of Dr. Hart's prior deposition testimony in other cases offered by plaintiff will not be admitted or considered.

### (2) Two printouts defining medical terms

Plaintiff has also offered for the court's consideration two printouts from an online medical dictionary defining the medical terms "impingement" and "nerve root impingement." The first defines an "impingement" as "Neurology Compression of a nerve or blood vessel through a constricted space. See Nerve root impingement." (Doc. No. 30–3.) The second defines "nerve root impingement" as "the abnormal protrusion of body tissue into the space occupied by a spinal nerve root." (Doc. No. 30–4.) The printouts include a "Disclaimer" that "[a]ll content on this website, including dictionary. . . data is for informational purposes only. This information should not be considered complete, up to date, and is not intended to be used in a place of a visit, consultation, or advice of a legal, medical, or any other professional." (Doc. Nos. 30–3, 30–4.)

Plaintiff argues that these medical definitions are evidence that Dr. Williams Federal's diagnostic report regarding plaintiff's March 12, 2012 MRIs supports plaintiff's contention that he qualifies for an exception to the "Other Limited Conditions" provision under the insurance policy. (Doc. No. 34 at 4:25-5:13.) However, as noted above, district courts "should not take additional evidence merely because someone at a later time comes up with new evidence that was not presented to the administrator." *Mongeluzo*, 46 F.3d at 944; *Micha*, 789 F. Supp. 2d at 1266. These two definitions from online medical dictionaries would appear to be barred from consideration by the court by this recognized restriction. Moreover, the printouts expressly disclaim the reliability of the definitions provided and, accordingly, are of little value in resolving any medical questions presented in this case. Finally, if the court finds the need to consult a dictionary for definition of any terms in resolving this action, it can do so on its own.

The two printouts offered by plaintiff would add nothing of significance to the ample record in this case. Therefore, the two printouts are not necessary for the court to consider in order to adequately conduct its *de novo* review and they will not be admitted or considered.

/////

*(3) Printout describing the specialty of Dr. Federal*

Next, plaintiff has attached to his brief a website printout reflecting that one of his own doctors, Dr. William Federal, specializes in "Diagnostic Radiology." (Doc. No. 30–2.) However, the record before the court already indicates that Dr. Federal is a medical doctor practicing at Valley MRI and Radiology, Inc. and that he reads MRIs and provides findings and conclusions based upon his review of those images. (AR at 258–63.) The online printout offered by plaintiff adds nothing to this record. Nor has plaintiff attempted to show any deficiency in the record before the court that this extrinsic evidence would address. The court therefore finds that the website printout regarding Dr. Federal's practice is not needed for the court to adequately conduct its *de novo* review of the plan administrator's decision and that extrinsic evidence will not be admitted or considered by the court.

# ADMINISTRATIVE RECORD

## A. The Group Long Term Disability Policy

Defendant issued Group Long Term Disability Insurance Policy number 647270-B to Rent-A-Center with an effective date of January 1, 2010. (AR at 890–932, 933–960.) The policy had a defined "Initial Rate Guarantee Period" of January 1, 2010 to January 1, 2014. (AR at 933, 937.) The policy states that it "may be renewed for successive renewal periods by the payment of the premiums set by us on each renewal date" and that the "length of each renewal period will be set by us, but will not be less than 12 months." (AR at 933.) The policy was amended several times, including on January 1, 2012. (AR at 923-24, 926–27.)

Under the policy, the eligibility for long term disability benefits changes depending on whether the individual has been collecting such benefits for more or less than twenty-four months. The "Own Occupation" period lasts for "[t]he first 24 months for which LTD Benefits are paid." (AR at 936.) The "Any Occupation" period lasts "[f]rom the end of the Own Occupation Period to the end of the Maximum Benefit Period." (*Id.*)

In relevant part the "Own Occupation" provision of the policy defines a disability as follows:

/////

During the Benefit Waiting Period and the Own Occupation Period, you are required to be Disabled only from your Own Occupation.

You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:

1. You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and

2. You suffer a loss of at least 20% of your Indexed Predisability Earnings when working in your Own Occupation.

. . .

Own Occupation means the job you are regularly performing for your Employer when Disability begins.

During the Benefit Waiting Period and the Own Occupation Period, Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation, that cannot be reasonably modified or omitted. In no event will we consider working an average of more than 40 hours per week, or if longer, the regularly scheduled hours for your Own Occupation, to be a Material Duty.

(AR at 943.)

In contrast, the "Any Occupation" provision of the policy is more preclusive and in relevant part defines disability as follows:

During the Any Occupation Period you are required to be Disabled from all occupations.

You are Disabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of Any Occupation.

Any Occupation means any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.

Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation, that cannot be reasonably modified or omitted. In no event will we consider working an average of more than 40 hours per week or, if longer, the regularly scheduled hours for your own Occupation, to be a Material Duty.

10

(AR at 943–44.)

Under the policy, the duration of eligibility for long term disability benefits also depends on the condition causing or contributing to the disability. Specifically, benefits for "Other Limited Conditions" are limited under the policy to twenty-four months unless the individual qualifies for an exception under the policy. The "Other Limited Conditions" provision states in relevant part:

> A. Mental Disorders, Substance Abuse and Other Limited Conditions.
>
> Payment of LTD Benefits is limited to 24 months during your entire lifetime for a Disability caused or contributed to by any one or more of the following, or medical or surgical treatment of one of more of the following:
>
> . . .
>
> 3. Other Limited Conditions
>
> . . .
>
> Other Limited Conditions means . . . chronic pain conditions (such as fibromyalgia, reflex sympathetic dystrophy or myofascial pain), . . . arthritis, diseases or disorders of the cervical thoracic, or lumbosacral back and its surrounding soft tissue, and sprains or strains of joints or muscles.
>
> However, *Other Limited Conditions does not include. . . herniated discs with neurological abnormalities that are documented by electromyogram and computerized tomography or magnetic resonance imaging ["MRI"],* scoliosis, radiculopathies that are documented by electromyogram, spondylolisthesis, grade II or higher, myelopathies and myelitis, traumatic spinal cord necrosis, osteoporosis, discitis, Paget's disease.

(AR at 951–52) (emphasis added).

The policy "Rules" for the application of the "Other Limited Conditions" provision state:

> 1. If you are Disabled as a result of a Mental Disorder or any Physical Disease or Injury for which payment of LTD Benefits is subject to a limited pay period, and at the same time are Disabled as a result of a Physical Disease, Injury, or Pregnancy that is not subject to such limitation, LTD Benefits will be payable first for conditions that are subject to the limitation.
>
> 2. No LTD Benefits will be payable after the end of the limited pay period, unless on that date you continue to be Disabled as a result of

11

a Physical Disease, Injury, or Pregnancy for which payment of LTD
Benefits is not limited.

(AR at 952.)

Finally, and also pertinent in this case, is the section of the policy entitled "Termination or Amendment of the Group Policy," which states in relevant part:

> We may change the Group Policy in whole or in part when any change or clarification in law or governmental regulation affects our obligations under the Group Policy, or with the Policyholder's consent.
>
> Any such change or amendment of the Group Policy may apply to current or future Members or to any separate classes or groups of Members.

(AR at 957.)

### B. *Plaintiff's Medical Records*

As noted above, plaintiff Ross Williams worked for Rent-A-Center as an Overnight Driver and was covered by the insurance policy discussed above when he fell and injured his back on January 18, 2012. (AR at 338.) Plaintiff was examined and his medical records were reviewed by numerous doctors over roughly the three years following that fall. This was done at first to diagnosis and treat plaintiff and subsequently to determine: (a) whether a herniated disc with neurological abnormalities was documented by MRIs administered to plaintiff on March 12, 2012, such that he would qualify for an exception to the "Other Limited Conditions" provision of the policy; and (b) whether he was disabled from all occupations, such that he would receive benefits during the "Any Occupation" period under the terms of that same policy.

Plaintiff was first treated by Dr. Kevin Buckman, an emergency medicine doctor at Lodi Memorial Occupational Health Medicine, on January 24, 2012.[3] (AR at 338.) Dr. Buckman noted that plaintiff "while at work was lifting a TV over his head, slipped and fell. He landed on washing machine to back [sic], then fell to the floor landing on buttocks. C/O pain to low and

---

[3] Unlike in cases involving review of determinations by Social Security, under ERISA no special deference is accorded to the opinions of treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003); *see also Montour v. Hartford Life & Acc. Ins. Co*., 588 F.3d 623, 635–36 (9th Cir. 2009).

mid-back, also some neck pain." (*Id.*) Dr. Buckman also noted, "Chronic LS pain with R+L leg radiation. Old injury while with FAA years ago." (*Id.*) Dr. Buckman advised plaintiff "Modified Duty – No liftin[g]/pushing/pulling over 2–5 pounds, avoid climbing/kneeling/squatting/ bending." *Id.*

On February 7 2012, Dr. Buckman completed a "Occupational Injury or Illness Provider Sheet" with respect to plaintiff. (AR at 314-15.) On February 14, 2012 Dr. Buckman completed a "Work Status Worksheet." (AR at 312.) On both forms the doctor indicated that plaintiff's "Work Status" was "Modified Work." (AR at 312, 314-15.) Under a restrictions section, Dr. Buckman checked the boxes for "No / Limit lifting, Pushing, Pulling more than 5 lbs," "Avoid tasks requiring climbing/kneeling/bending/squatting," and "No prolonged sitting." (*Id.*) Dr. Buckman did not check options for "Do not work more than 4/6/8 hr/per work day" and "Limit standing or walking to 2/4/6 hr/per work shift." (*Id.*) On February 21, 2012, Dr. Buckman again completed the "Work Status Worksheet" with respect to plaintiff, but unlike before, Dr. Buckman at that time did not check the box for "[n]o prolonged sitting." (AR at 288.) Dr. Buckman otherwise completed the form in the same fashion as those completed earlier in February of 2012. (*Id.*)

On March 12, 2012, plaintiff had lumbar and cervical MRIs performed. (AR at 258–59.) In his report interpreting the results of those MRIs, Dr. William Federal noted that plaintiff's lumbar MRI showed "a left posterior disc herniation seen at L5–S1, which mildly impinges on the emerging left S1 nerve root. Mild L5-S1 facet arthropathy is present, greater on the left." (AR at 259.) Dr. Federal further noted "[l]eft posterior disc protrusion, L5–S1, which does appear to mildly impinge on the left S3 nerve root." (AR at 260.)

On April 3, 2012, orthopedic surgeon Dr. Gary Alegre of the Alpine Orthopaedic Medical Group, Inc. conducted spine consultation with plaintiff on a referral from treating physician

/////

/////

/////

/////

13

Dr. Buckman.[4]  (AR at 125–30.)  Dr. Alegre stated "[t]he pain the lower back is pretty diffuse as well.  He does get some radiating symptoms over the right lower extremity.  He denies any radicular complaints into the left lower extremity."  (AR at 125.)  Dr. Alegre also reported that plaintiff's "lumbar MRI from 3/12/2012, was reviewed, showing a left lateral disc protrusion at L5–S1, causing some effacement and impingement upon the left S1 nerve root."  (AR at 127.)[5]  In the neurologic section of his report, Dr. Alegre noted "[t]he patient demonstrates 5 out of 5 manual motor testing strength in the upper and lower extremities.  Deep tendon reflexes are present in the upper and lower extremities but not pathologic."  (*Id*.)  Dr. Alegre concluded that plaintiff did "have some underlying degenerative changes and had some radicular symptoms into the left arm but at this point he remains neurologically intact and has no nerve root tension signs.  I feel the patient should undergo more physical therapy, anti-inflammatories, give this time, and to gradually return to work."  (*Id*.)

On April 18, 2012, plaintiff again visited his first treating physician, Dr. Buckman.  (AR at 290.)  In an "Attending Physician's Statement," under the section referring to "reasonable work or job site modifications . . . the employer [could] make to assist the individual to return to work," Dr. Buckman wrote "no lifting over 5 lbs."  (AR at 286.)  Dr. Buckman also checked boxes on the form indicating plaintiff's condition had improved and was expected to continue to improve.  (*Id*.)  He further indicated that the plaintiff should not stop working but instead could return to work that very day on modified duty.  (*Id*.)  Dr. Buckman also completed the "Work Status Worksheet" again the same as he did on February 21, 2012.  (AR at 288.)  In another form, Dr.

---

[4]  It appears to be plaintiff's position that he was referred to Drs. Buckman, Alegre, Phan and Rhee in connection with his workers compensation claim stemming from his fall and that those doctors were all selected by the workers compensation claim administrator.  (AR at 435-36.)  Nonetheless, the record before the court reflects that those were the physicians who treated plaintiff in 2012–13, up until the time he saw Dr. Leslie Farmer at the Veteran's Administration in the second half of 2013.

[5]  Although the record is not entirely clear, it does not appear that Dr. Alegre reviewed the actual lumbar MRI images, but rather reviewed Dr. Federal's interpretation of those images.  The court bases this conclusion on the fact that Dr. Alegre specifically noted that he "personally reviewed [plaintiff's] cervical MRI," but conversely states that the "lumbar MRI from 3/12/2012 was reviewed."  (AR at 126–27.)

Buckman assessed plaintiff's functional capacity and indicated that he could stand or walk "[l]ess than 8 HOURS per 8 hour day" and that plaintiff could sit "[l]ess than 4 HOURS per 8 hour day." (AR at 294.)

On May 9, 2012, Dr. Buckman again evaluated plaintiff and reviewed his medical records. In a supplemental report based upon this evaluation and review, Dr. Buckman stated that:

> [Plaintiff] has a positive MRI of his back which does show disc herniation with impinges on the S1 nerve root. He has very limited ROM [range of motion] of the back, and positive radicular signs with only 10 degrees of leg elevation and other clinical findings, he has a difficult time walking and getting in or out of a chair. Based on the Guidelines to the Evaluation of Permanent Impairment pages 384–385 as well as other pages, and Table 15-3, I would like to revise my prior determination. It is my determination that he has a 7.5% Impairment Rating due to Lumbar Injury.

(AR at 185.)[6]

Thereafter, by letter dated July 23, 2012, defendant Standard informed plaintiff that it had approved his long term disability claim. (AR at 704–07.) As noted above, defendant subsequently paid plaintiff long term disability benefits for the duration of the initial twenty-four month "Own Occupation" period. However, by letter dated September 4, 2012, defendant listed plaintiff's diagnosis as "left posterior lateral disc protrusion with mild impingement on left S1 nerve root," and informed plaintiff that his long term disability benefits would be subject to the twenty-four month limitation under the policy's "Other Limited Conditions" provision since his condition was a "disease[] or disorder[] of the cervical thoracic, or lumbosacral back and its surrounding soft tissue." (AR at 1129.) Plaintiff objected to this determination by Standard by letter dated September 10, 2012. (AR at 688.) Defendant responded that as part of the administrative review, a physician consultant was reviewing plaintiff's claim. (AR at 517.)

On September 5 and 17, 2012, plaintiff again visited his first treating physician, Dr. Buckman. (AR at 64, 66.) Both times, Dr. Buckman completed the same "Work Status Worksheet" in the same manner as he had back on April 18, 2012, by not checking the boxes for

---

[6] A 7.5 percent impairment rating for a lumbar spine injury corresponds to a "mild" problem in the Definition of Impairment Classes and Impairment Ranges Chart. *See* Robert D. Rondinelli, *Guide to the Evaluation of Permanent Impairment* 559 (6th ed. 2008).

"No prolonged siting," "Do not work more than 4/6/8 hr/per work day," and "Limit standing or walking to 2/4/8 hr/per work shift." (*Id*.) In another form, Dr. Buckman again indicated that plaintiff could stand or walk "[l]ess than 8 HOURS per 8 hour day" and that he could sit "[l]ess than 4 HOURS per 8 hour day." (AR at 73.) Dr. Buckman also noted that "I am not able to make a determination of preexisting back injury due to lack of information and past studies, reports, and evaluations." (AR at 72.)

On October 30, 2012, Dr. Alex Phan of Alpine Orthopedic Medical Group examined plaintiff for the first of many times. (AR at 163.) Dr. Phan noted that:

> MRI done 3-12-12 shows posterior disc herniation seen at L5-S1 impinging on the left S1 nerve, as well as multilevel facet anthropathy, worse on the left than right side. Congenitally broad facets which are more oriented in the anterior posterior than usual. Facet arthropathy worse at the L3-L4 and L5-S1 levels. Read by Dr. William Federal.

(AR at 165.) Dr. Phan also wrote "[l]eft more than right back pain with radiation to the posterior legs just above the knees, likely secondary to possible left S1 radiculopathy." (*Id*.) In the neurologic section of his report, Dr. Phan reflected that "[t]he patient appears alert and cooperative. Responds to questions is coherent, oriented X3 with normal motor, reflexes and sensory response." (AR at 164.) Dr. Phan also indicated that "[a]ggravating factors are walking, standing, driving, standing up straight" and that "[plaintiff] is unable to lay on his back." (AR at 163.)

On December 14, 2012, Dr. Phan wrote that plaintiff's primary diagnosis was "[s]ciatica w/ herniated disc." (AR at 216) Dr. Phan noted that "barriers to a return to work" included "limited ability to walk, sit, lift." (*Id*.) Dr. Phan checked boxes on a form he completed indicating that plaintiff's capacity for each sitting, standing, and walking was "frequently," i.e., "34%–66%" of the time. (AR at 217.) Dr. Phan again examined plaintiff on January 7, 2013. (AR at 111.) At that time Dr. Phan reported "[l]eft more than right back pain with radiation to the posterior legs just above the knees, likely secondary to possible left S1 radiculopathy." (AR at 115.)

/////

On January 23, 2013, a consulting orthopedic surgeon, Dr. Kenneth Kopacz, reviewed plaintiff's medical records at the request of defendant Standard. (AR at 203–06.) In his report, Dr. Kopacz concluded that:

> The MRI of the lumbar spine shows a left lateral disc protrusion with some impingement of the S1 nerve root.
>
> The claimant's exam shows restricted ROM and tenderness. His neurological exam is normal. Given the clinical findings, the claimant would be restricted in no lifting greater than 10 pounds, occasional bending, sitting without restrictions and standing/walking to no greater than 2 hours per day.
>
> This would be due to the lumbar and cervical degenerative disc disease. The diagnosis of disc herniation with nerve root impingement is not supported by the documentation.

(AR at 205.)

On February 4, 2013, plaintiff again saw Dr. Phan who once again detailed "[l]eft more than right back pain with radiation to the posterior legs just above the knees, now below likely secondary to possible left S1 radiculopathy." (AR at 98–100.) Dr. Phan also noted "[n]eurological: [n]ormal reflexes and distal sensation." (AR at 99.) Plaintiff next saw Dr. Phan on March 4, 2013. (AR at 94–96.) Plaintiff saw Dr. Phan for the final time on April 1, 2013. (AR at 87–89.) At that time, according to Dr. Phan, "[plaintiff had] wrote a long letter and requested [th]at I sign[] it--basically, the letter indicated that I dictated his care and I was being unethical in doing so." (AR at 87.) Dr. Phan concluded "I have read his letter and I will refuse to sign it as it does not reflect what I have discussed with him--he bec[a]me confrontational. At this time, I feel that we are at an impasse and in deep disagreement. I will formally discharge him from my service." (AR at 89.)

On May 2, 2013, plaintiff was seen by Dr. James Rhee of the Northern California Spine Institute. (AR at 49–51.) Dr. Rhee wrote that plaintiff "is a well-developed male in no acute distress while sitting, although he complains of increased pain." (AR at 50.) Dr. Rhee also reported that plaintiff "notes the symptoms are aggravated with prolonged sitting and walking, but does not identify any limb weakness. However, lying down sometimes will alleviate or aggravate his pain issues." (AR at 49.) Dr. Rhee concluded that plaintiff's "medical records and

MRI would suggest a left lumbar radiculopathy in a possibly left S1 pattern for the most part, although he did not allow me to complete a physical exam today." (AR at 50.)

On May 7 and 28, 2013, plaintiff again saw Dr. Buckman and both times Dr. Buckman again completed the "Work Status Worksheet" as on prior visits. (AR at 54–56.)

By report dated May 22, 2013, Kristen Peterson, a vocational case manager for defendant, evaluated plaintiff's occupational skills. (AR at 742–54.) Ms. Peterson assumed that "[a]ccording to the Analyst's memo dated 05/08/2013, the claimant is limited to no lifting greater than 10 lbs, occasional bending, sitting without restrictions and standing/walking no longer than 2 hours per day." (AR at 746.)[7] She further considered plaintiff's work history and transferable skill in concluding that appropriate "occupations exist in the claimant's labor market in sufficient numbers to allow reentry into the workforce." (AR at 751.) Specifically, Ms. Peterson identified the positions of motor vehicle dispatcher, customer-complaint clerk, and traffic clerk as available jobs in the labor market that plaintiff could perform with his limitations. (*Id.*)

On August 29, 2013, treating physician Dr. Leslie Farmer with the Veteran's Administration completed a "Physician's Report – Musculoskeletal" with respect to plaintiff. (AR at 199–201.) Dr. Farmer listed plaintiff's primary diagnosis as "Herniated Disc" and a secondary diagnosis as "Radioclitis sciatica."[8] (AR at 199.) She described plaintiff's symptoms as "[r]adiating pain to LT>RT leg with foot numbness, difficulty standing/ sitting/walking for extended time periods. Chronic LBP with sciatica." (*Id.*) Dr. Farmer identified the barriers to plaintiff returning to work as "[d]ecreased ROM / flex[i]bility from back pain and difficulty maintaining positions i.e. walk, sit, stand for extended time periods." (*Id.*) Dr. Farmer anticipated plaintiff's return to work in "12 mos- then review." (*Id.*) Dr. Farmer also checked boxes on a form indicating that plaintiff could sit for "34%–66%" of the time and stand "1%–

---

[7] It appears that Ms. Peterson was in fact relying on consulting orthopedic surgeon Dr. Kopacz's January 2013 report in rendering her opinion, since the record before the court reveals no other doctor indicating that plaintiff can "sit[] without restrictions." (*See* AR at 205.)

[8] "Radioclitis" here seems to be in reference to "radiculitis" in that Dr. Farmer provided the corresponding ICD Code 724.4, which references "Thoracic or lumbosacral neuritis or radiculitis unspecified."

33%" of the time.  (AR at 200.)

Dr. Farmer provided a letter dated November 8, 2013, to defendant Standard in which she stated that plaintiff "should continue to avoid: . . . No prolonged sitting/standing."[9]  (AR at 191.) On November 8, 2013, Dr. Farmer responded to an inquiry from plaintiff's counsel.  (AR at 186, 628.)  In responding to that inquiry, Dr. Farmer also signed a statement prepared by plaintiff's counsel stating that in her opinion "it is probable that [plaintiff] would be unable to attend any work at least 3 to 4 days a month, and perhaps more."  (*Id*.)

As noted, on June 4, 2014, defendant Standard informed plaintiff that benefits for his "Other Limited Condition" first began on July 17, 2012 and therefore, "the 24 month Maximum Benefit Period for Other Limited Conditions will end on July 16, 2014."  (AR at 1080–88.) Defendant Standard justified the termination of benefits on the basis that "we have completed a review of your claim and determined that you will not meet the Any Occupation Definition of Disability which becomes effective July 17, 2014."  (AR at 1082.)

On June 30, 2014, plaintiff forwarded to defendant a "vocational assessment" that he completed himself.  (AR at 601–03.)  Therein, plaintiff wrote:

> The Medical condition of Mr. Williams is provided by the attending Physician, Dr. Farmer.  Dr. Farmer states "Mr. Williams should not sit, stand, or walk for extended periods of time."
>
> Dr. Farmer further states, Mr. Williams is unable to attend work of any kind at least 3-4 days, and possibly more days per week.[10]

(AR at 602.)  In his June 30, 2014 self-assessment, plaintiff expressed his opinion that due to his medical condition, as well as his high school education of forty-two years ago and lack of computer skills, he was unable to perform the duties of any occupation.  (AR at 602–03.)

---

[9]  The use of a double negative here does not appear to be intentional.

[10]  The court notes that plaintiff's statement in this regard does not accurately report Dr. Farmer's opinion.  As noted above, Dr. Farmer signed a statement prepared by plaintiff's counsel which provided that "it is probable that [plaintiff] would be unable to attend any work at least 3 to 4 days *a month*, and perhaps more."  (AR at 186, 628) (emphasis added).  Moreover, Dr. Farmer did not state plaintiff should not sit, stand, or walk for extended periods of time, but rather only stated that plaintiff had difficulty doing so.  (AR at 199.)

In a letter dated June 6, 2014, and received by defendant Standard on July 24, 2014, Dr. Farmer wrote "Mr. Williams was injured at work January 2012. He experiences excessive back spasms, and Sciatica due to Herniated Discs with neurological abnormalities, MRI 3/12/2012." (AR at 181.) On July 16, 2014, Dr. Farmer listed a primary diagnosis of herniated disc, with a secondary diagnosis of "radioclitis sciatica." (AR at 585.) Dr. Farmer at that time again stated that plaintiff has "herniated discs with neurological abnormalities as documented by 03/12/2012 MRI" with the symptoms "LBP w/ numbness extending l/r legs & feet. Painful with any movement. Cannot bend or move w/o sciatica spasms." (*Id*.) Dr. Farmer noted, as she previously had, that barriers to plaintiff returning to work were "[d]ecreased ROM, difficulty walking, standing, sitting, maintaining position, decreased flexibility." (AR at 182.) Dr. Farmer again checked the box on the form indicating that plaintiff could only sit "34%–66%" of the time. (AR at 183.)

Consulting physician Dr. John Hart prepared a report dated September 25, 2014 after being retained by defendant to review plaintiff's medical records. (AR at 18–24.) In that report, Dr. Hart states "[t]he MRI of the lumbar spine showed a possible encroachment of the SI root on the left." (AR at 21.) Dr. Hart also observed that, "[t]he MRI notes that the L5-S1 disc 'mildly impinges on the emerging left S1 root.' The medical records document there is no evidence of radiculopathy. This finding would be considered within normal limits as there is no corresponding physical examination finding supporting an S1 radiculopathy." (AR at 22.) He further explained that plaintiff's herniated disc impinging on the S1 nerve root was not causing neurological abnormalities. (AR at 6.) In conclusion, consulting physician Dr. Hart opined that "the claimant is capable of doing a sedentary level of occupation without limitations or restrictions. Ergometric seating may be of value."[11] (AR at 23.)

By letter dated October 16, 2014, defendant informed plaintiff that his long term disability benefits had been terminated and that this decision had been upheld on appeal on the basis that his disabling condition was an "Other Limited Condition" and that it was determined he could

---

[11] The court assumes Dr. Hart meant to use the word "ergonomic" and not "ergometric."

perform a sedentary job.  (AR at 497–516.)  On January 15, 2015, plaintiff's treating physician at the VA, Dr. Farmer, wrote a letter to defendant stating that "[w]ith [plaintiff's] diagnosis of Chronic Back Pain with Sciatica related to Disc Herniation it is impossible for him to tolerate any period greater than 33% of sitting, standing, walking and bending, as reflected in the rest of my assessment of his physical capacity."  (AR at 434.)

On March 16, 2015, plaintiff filed this complaint under § 502(a) of ERISA.

## ANALYSIS

Defendant advances two grounds for its termination of plaintiff's long term disability benefits.  First, defendant contends plaintiff does not qualify for an exception to the "Other Limited Conditions" provision under the Plan because he does not have a herniated disc with documented neurological abnormalities.  Second, defendant claims plaintiff is not disabled from all occupations, and thus does not qualify for benefits during the "Any Occupation" period of his policy.  Either one of these grounds, if established, would provide a recognized justification for the termination of plaintiff's benefits under the terms of the Plan.  Reviewing the decision *de novo* and for the reasons explained below, the court concludes that the plan administrator's decision was supported on both grounds.

### A.  The Exception to the "Other Limited Conditions" Exclusion Under the Plan.

"When a district court reviews de novo a plan administrator's determination of a claimant's right to recover long term disability benefits, the claimant has the burden of proving by a preponderance of the evidence that he was disabled under the terms of the plan."  *Armani v. Northwestern Mutual Life Insurance Co.*, 840 F.3d 1159, 1162–63 (9th Cir. 2016) (citing *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010)).  However, if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer has the burden of proving the exclusion applies.  *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003); *see also Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992) ("An insurer's contention that a loss suffered is excepted by the policy's terms is generally regarded as an affirmative defense.").  Plaintiff, in turn, has the burden of proving that an

exception to the exclusion restores coverage. *Cooper Dev. Co. v. Employers Ins. of Wausau*, 765 F. Supp. 1429, 1431 (N.D. Cal. 1991); *see also Zaccone v. Standard Life Insurance Co.*, 36 F. Supp. 3d 781, 783 (N.D. Ill. 2014).

Here, the parties do not dispute that plaintiff falls within the "Other Limited Conditions" exclusion provision of his long term disability insurance policy. (Doc. Nos. 30 at 7; 31 at 18.) It also appears to be, for the most part, undisputed that a March 12, 2012 MRI (the only MRI ever performed on plaintiff) indicates that he suffers from a herniated disc at L5-S1 which mildly impinges on the emerging left S1 nerve root. (*See* AR 259.) Rather, the dispute in this case centers on whether with that condition plaintiff suffers from "neurological abnormalities" as required for him to qualify for an exception to the "Other Limited Conditions" of the policy. (Doc. Nos. 25, 5:11–17; 31, 5:1–6:4.) Accordingly, plaintiff bears the burden of establishing the applicability of this exception recognized in the policy. Specifically, the exception at issue here provides that the Other Limited Conditions exclusion does not include "herniated discs *with neurological abnormalities that are documented by electromyogram and computerized tomography or magnetic resonance imaging*." (AR at 952) (emphasis added).

Plaintiff, points to VA Dr. Farmer's conclusions and Dr. Federal's report as conclusively establishing that he suffers from a herniated disc with neurological abnormalities, arguing that any nerve root impingement is per se a "neurological abnormality." (Doc. No. 30 at 7–8.) In contending that there is no evidence of any neurological abnormality being associated with plaintiff's condition, defendant too relies on Dr. Federal's interpretation of plaintiff's MRI as documenting merely a "mild" nerve root impingement without any indication of radiculopathy. (Doc. Nos. 26 at 23; 31 at 9.) Defendant also point to the opinions of its consulting physicians Dr. Hart and Dr. Kopacz, as well as spine surgeon Dr. Alegre, as all suggesting that a neurological abnormality requires some physical manifestation which is absent here. (*See* Doc. Nos. 26 at 23-24; 31 at 9–14.)

The critical term here, "neurological abnormalities," is not defined in the policy. At oral argument counsel reported that they had not found any definition for that term as used in the policy. When faced with questions calling for the interpretation of insurance policy language

under ERISA, federal courts apply federal common law. *Firestone*, 489 U.S. at 110; *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98 (1983) (holding that federal common law of ERISA preempts state law in the interpretation of ERISA benefit plans); *Williams v. National Union Fire Insurance Co. of Pittsburgh, PA*, 792 F.3d 1136, 1140 (9th Cir. 2015). "In construing the language of an ERISA-governed policy, courts apply federal common law."). Under the federal common law courts are to "interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience." *Babikian v. Paul Revere Life Ins. Co.*, 63 F.3d 837, 840 (9th Cir. 1995) (internal quotations and citation omitted); *see also Williams*, 792 F.3d at 1140.

While the term "neurological abnormalities" appears often in court decisions addressing disability claims, it is not often defined. One definition the court has located defines the term as follows:

> Neurological abnormalities are traditionally classified as "hard signs," impairments in basic motor, sensory, and reflex behaviors . . . and "soft signs," which refer to more complex phenomena such as abnormalities in motor control, integrative sensory functions, sensorimotor integration, and cerebral laterality. Neurological soft signs are neither indicative of dysfunction of a specific brain region nor part of a well-defined neurological syndrome.

Mahesh Hembram, et al., *First Rank Symptoms and Neurological Soft Signs in Schizophrenia*, PSYCHIATRY J., Apr. 2014, at 1–2. The term appears to be employed in medical literature in a manner consistent with this definition. *See* Raymond Chan, et al., *Neurological abnormalities and neurocognitive functions in healthy elder people: A structural equation modeling analysis*, BEHAVIORAL AND BRAIN FUNCTIONS Aug. 2011, at 1–2; Timothy Griffiths, et al., *Neurological abnormalities in familial and sporadic schizophrenia*, 121 BRAIN 191 (1998); Eric Chen, et al., *The Cambridge Neurological Inventory: a clinical instrument for assessment of soft neurological signs in psychiatric patients*, 56 PSYCHIATRY RES. 183 (1995).

Thus, the ordinary meaning of the term "neurological abnormalities" is a manifested impairment to either motor functions, sensory functions, reflexes, or cognitive functions. Contrary to plaintiff's contention, a mild nerve root impingement is not per se a "neurological abnormality," but rather also requires some manifestation of impairment to one of the above listed

areas. This meaning is consistent with the manner in which courts have applied the term in somewhat similar contexts as that presented here. *See Duran v. Colvin,* 14 Civ. 8677 (HBP), 2016 WL 5369481, at *19 (S.D. N.Y. Sept. 26, 2016) (rejecting an ALJ's conclusion that the record did not reflect objective neurological abnormalities because electro-diagnostic testing showed evidence of chronic radiculopathy, a nerve conduction test reflected lumbosacral radiculopathy involving nerve roots, and a motor nerve study also showed chronic radiculopathy, all of which was consistent with the findings of the MRI); *Lapetina v. Secretary of Dept. of Health and Human Services*, 500 F. Supp. 167, 168 (E.D. N.Y. 1980) ("The report repeats the diagnosis of herniated disc of the lumbar spine but with no neurological abnormality or sensory abnormalities. Dr. Saal advised that plaintiff could walk and sit for indefinite periods of time but is restricted in lifting and bending. He had a normal range of motion for grasp and manipulation and in Dr. Saal's opinion he was only 'partially disabled' and could definitely handle a sedentary job and possibly a light job."); *Clause v. Astrue*, No. CIV. A. 07-4169, 2009 WL 1941276, at *9 (E.D. La. Feb. 3, 2009) (finding that the ALJ properly weighed conflicting medical opinions in determining that even though plaintiff was diagnosed with radiculitis, defined as "inflammation of the root of a spinal nerve," plaintiff did not have neurological abnormalities), *report and recommendation adopted*, 2009 WL 1948919 (E.D. La. July 6, 2009).

Application of such a definition is also consistent with the findings of defendant's consulting doctors, Dr. Hart and Dr. Kopacz, that plaintiff's medical records do not reflect any impairment of his motor functions, sensory functions, reflexes, or cognitive functions. (AR at 19, 21-23, 205.) Moreover, and of particular significance, on April 3, 2012, in the neurologic section of his report, orthopedic surgeon Dr. Alegre noted "[t]he patient demonstrates 5 out of 5 manual motor testing strength in the upper and lower extremities. Deep tendon reflexes are present in the upper and lower extremities but not pathologic." (AR at 127.) Dr. Alegre also concluded that plaintiff "does have some underlying degenerative changes and had some radicular symptoms into the left arm but at this point he remains neurologically intact and has no nerve root tension signs." (*Id.*) Likewise, on October 30, 2012, in the neurologic section of his report, Dr. Phan reported "[t]he patient appears alert and cooperative. Responds to questions is coherent, oriented

X3 with normal motor, reflexes and sensory response." (AR at 164.) On February 4, 2013, Dr. Phan also noted "[n]eurological: [n]ormal reflexes and distal sensation." (AR at 99.)

It is true that Dr. Farmer, of the VA, concluded that plaintiff has "herniated discs *with neurological abnormalities as documented by 03/12/2012 MRI*." (AR at 585) (emphasis added). It is also true that plaintiff's treating physician Dr. Buckman noted "positive radicular signs" (AR at 185), Dr. Alegre noted radicular symptoms (AR at 127), Dr. Phan noted "possible" radiculopathy (AR at 115), and Dr. Rhee found that medical records "suggest" radiculopathy (AR at 50). However, Dr. Farmer, is the only doctor to definitively diagnose plaintiff as suffering from radiculitis. (AR at 199.) Dr. Farmer's stated conclusion that plaintiff suffers from "neurological abnormalities," however, is inconsistent with all of the other medical evidence of record in that Dr. Phan and Dr. Alegre, as well as consulting physicians Dr. Hart and Dr. Kopacz, all concluded that plaintiff was neurologically intact and unimpaired.

Thus, this is not a case where there is an absence of evidence upon which the plan administrator could have relied in reaching the decision to deny or terminate benefits.[12] Rather, here there is significant affirmative evidence in the record indicating that plaintiff did not suffer from "neurological abnormalities" and the plan administrator simply credited that reliable evidence (*see* AR 497–516) over the statement made by one of plaintiff's treating physicians. *See Black & Decker Disability Plan*, 538 U.S. at 831 ("Nothing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating

---

[12] The Ninth Circuit has explained:

> [W]here the denials were based on absence of some sort of medical evidence or explanation, [ ] the administrator was obligated to say in plain language what additional evidence it needed and what questions it needed answered in time so that the additional material could be provided. An administrator does not do its duty under the statute and regulations by saying merely 'we are not persuaded' or 'your evidence is insufficient.' Nor does it do its duty by elaborating upon its negative answer with meaningless medical mumbo jumbo.

*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 680 (9th Cir. 2011).

physician's opinion.").

Finally, aside from this definition of "neurological abnormalities" identified above, the court is compelled to return to the language of the plan in general as it applies to the determination under review. Here, the language of the policy clearly treats herniated discs and neurological abnormalities as separate requirements. The decision in *Wilcox v. Standard Ins. Co.*, 340 F. Supp. 2d 1266 (N. D. Ala. 2004) is particularly instructive. In that case, a former employee with herniated discs sought court review of the decision to terminate his disability benefits under a plan similar to the one at issue at here. Employing a *de novo* standard of review, the court upheld the administrator's decision to terminate benefits under the plan and in doing so explained as follows:

> Plaintiff asserts that . . . he is entitled to LTD benefits because his two herniated disks were documented by MRI[.] He avers that defendant's final denial of benefits acknowledges the existence of the herniated disks on the one hand, but discounts the evidence established by the MRIs on the other.

> Plaintiff's argument ignores the plain language of the policy. The policy . . . provides that LTD benefits are limited to 12 months for musculoskeletal or connective tissue disorders, including any disease or disorder of the cervical, thoracic, or lumbosacral back and its surrounding soft tissue. The limitation will not apply to "herniated disks with neurological abnormalities that are *documented by electromyogram, **and** computerized tomography or magnetic resonance imaging*" or "*radiculopathies* that are *documented by electromyogram.*" [emphasis added]. In plaintiff's case, his January 2001 MRI showed minimal herniation or bulging of three discs with a minimal to no thecal sac indentation. The July 2002 MRI again showed mild to moderate protrusion of the discs with minimal to no thecal sac indentation and no impingement on the proximal S1 nerve roots or any other nerve roots. Electromyogram and nerve conduction studies performed by Dr. Naguszewski were negative. Plaintiff also had a diagnosis of probable radiculopathy. However, plaintiff also had to show positive electromyogram results to go along with the MRI results and diagnosis in order to avoid the policy limitation. He did not do so; instead, as already noted, all EMG studies performed by his treating physicians were negative.

> Requiring a benefits claimant to submit definitive, objective evidence of neurological abnormalities or nerve root involvement in order to obtain LTD benefits of longer than 12 months for musculoskeletal or connective tissue disorders, including radiculopathy or any disease or disorder of the cervical, thoracic, or lumbosacral back and its surrounding soft tissue, is not "wrong" as that term is defined in ERISA jurisprudence. In addition,

interpretation of the plan language to require such evidence to support plaintiff's claim for LTD benefits for such conditions is not "wrong." The court does not disagree with the claims administrator's plan interpretation. Accordingly, because the decision was not "wrong," then summary judgment must be entered in favor of Standard and against plaintiff.

*Id*. at 1282–83.

Were this a case involving the review of a denial of social security benefits, where the Commissioner has a duty to fully develop the record, the court might remand the matter with direction to obtain the results of an electromyogram and nerve conduction studies. *See Wren v. Sullivan*, 925 F.2d 123, 128 (9th Cir. 1991) (in the social security context, consultative examinations may be necessary to develop a full and fair record but the decision to require such an examination is discretionary). But this is not a social security case. Rather, it is a case in which plaintiff's claim must be assessed by the court strictly under the terms and requirements of the Plan policy. *See Zaccone v. Standard Life Insurance Co.*, 36 F. Supp. 3d 781, 798800 (N.D. Ill. 2014) ("Mr. Zaccone has not provided the kind of evidence the Group Plan mandates. Again, this is not to say that he is not suffering pain or is not disabled under other definitions of disability. It is just to say that, under the Group Plan, he is not entitled to any more than twelve months of benefits, which he has already received.")

Here, plaintiff did not meet his burden of proving he qualifies for an exception to the "Other Limited Conditions" exclusion provision of the policy and the plan administrator was, therefore, justified in denying him continuing benefits under the policy on this basis.

### B. Plaintiff's Disability From All Occupations Precluding Benefits During the "Any Occupation" Period.

Plaintiff also bears the burden of showing that he is disabled from all occupations during the "Any Occupation" period of the long term disability policy. *See Armani*, 840 F.3d at 1162-63; *Muniz*, 623 F.3d at 1294. Plaintiff is eligible for benefits under the Plan during the "Any Occupation Period" if he is able to show that he is not:

able to perform, whether due to education, training, or experience, [any occupation or employment] which is available at one or more locations in the national economy and in which you can be expected

27

> to earn at least 60% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.

(AR at 943–44.) Here, defendant Standard relied upon a vocational analysis who rendered an opinion that plaintiff failed to meet this standard because there were qualifying jobs he was capable of performing with his limitations. (AR at 742–54.) The only evidence submitted on behalf of plaintiff addressing this issue was plaintiff's own self-assessment of his inability to perform any work in light of his condition and the limitations it imposed on him. (AR at 601-03.)

At bottom, the dispute here is over just how limited plaintiff is rendered as a result of his back condition. Defendant's vocational expert, Kristen Peterson, considered plaintiff's work history and transferable skill in concluding that appropriate "occupations exist in the claimant's labor market in sufficient numbers to allow [his] reentry into the workforce." (AR at 751.) Specifically, Ms. Peterson identified motor vehicle dispatcher, customer-complaint clerk, and traffic clerk as jobs which plaintiff was able to perform. (*Id*.) As noted above, it appears that Ms. Peterson relied upon limitations found by consulting physician Dr. Kopacz (no lifting greater than 10 lbs, occasional bending, sitting without restrictions and standing/walking no longer than 2 hours per day (AR at 746)), even though there was no other medical support for the finding that plaintiff could sit without restrictions.

Conversely, plaintiff himself relied on the report of Dr. Farmer in concluding that his "inability to walk, sit, or stand, precludes performing Any occupation." (AR at 603.) In that self-assessment, however, plaintiff also inaccurately represented that Dr. Farmer had stated that "Mr. Williams is unable to attend work of any kind at least 3–4 days, and possibly more days *per week*." (AR at 602) (emphasis added). As noted above, plaintiff's representation in this regard misstates Dr. Farmer's statement as it appears in the record before the court. The statement which Dr. Farmer signed, which was prepared by plaintiff's own counsel, actually stated: "it is probable that [plaintiff] would be unable to attend any work at least 3 to 4 days *a month*, and perhaps more." (AR at 186, 628) (emphasis added).

The court has fully reviewed the record. The weight of the evidence reflected therein indicates plaintiff is capable of performing sedentary work. Immediately after plaintiff's fall, on

February 7 and 14, 2012, plaintiff's treating physician Dr. Buckman reported that his "Work Status" was "Modified Work." (AR at 312, 315.) Under "restrictions" in his form report, Dr. Buckman checked the boxes for "No / Limit lifting, Pushing, Pulling more than 5 lbs," "Avoid tasks requiring climbing/kneeling/bending/squatting," and "No prolonged sitting." (*Id.*) However, Dr. Buckman did not check options on the form report indicating "Do not work more than 4/6/8 hr/per work day" and "Limit standing or walking to 2/4/6 hr/per work shift." (*Id.*)

On February 21 and April 18, 2012, Dr. Buckman completed the same form report reflecting the same findings that he had registered on February 7 and 14, 2012, except that in those later reports he no longer checked the box for "[n]o prolonged sitting." (AR at 288, 309.) On April 18, 2012, in an "Attending Physician's Statement," Dr. Buckman indicated that plaintiff's condition had in fact improved and was expected to continue to improve. (AR at 286.) He further indicated that plaintiff should not stop working and could return to work on modified duty that day. (*Id.*) In a "Primary Treating Physician's Permanent and Stationary Report," treating physician Dr. Buckman assessed plaintiff's functional capacity, indicating that plaintiff could stand or walk "[l]ess than 8 HOURS per 8 hour day" and could sit "[l]ess than 4 HOURS per 8 hour day." (AR at 294.) Over roughly the following year and a half, plaintiff's treating physician Dr. Buckman completed these same form reports numerous times, each time completing them in a relatively similar fashion.

In assessing plaintiff's limitations as a result of his back condition, Dr. Buckman's findings are supported by the reports of the other doctors appearing in the evidence of record. On April 3, 2012, Dr. Alegre noted "I feel the patient should undergo more physical therapy, anti-inflammatories, give this time, and to gradually return to work." (AR at 127.) On December 14, 2012, Dr. Phan noted that while "barriers to a return to work" included "limited ability to walk, sit, lift," plaintiff's capacity for each sitting, standing, and walking was "frequently," i.e., "34%–66%" of the time. (AR at 216–17.) On May 2, 2013, Dr. Rhee wrote that plaintiff "is a well-developed male in no acute distress while sitting, although he complains of increased pain." (AR at 50.) Defendant's consulting doctors, Dr. Hart and Dr. Kopacz, also agreed that plaintiff could perform sedentary work. (AR at 18–24, 203–06.)

Plaintiff's treating physician at the VA, Dr. Farmer, is the lone medical source to suggest that plaintiff is incapable of sedentary work. On November 8, 2013, Dr. Farmer recommended no prolonged sitting/standing for plaintiff. (AR at 191.) After defendant upheld its decision to terminate plaintiff's benefits on appeal, Dr. Farmer wrote a letter on January 15, 2015 stating that "[w]ith [plaintiff's] diagnosis of Chronic Back Pain with Sciatica related to Disc Herniation it is impossible for him to tolerate any period greater than 33% of sitting, standing, walking and bending, as reflected in the rest of my assessment of his physical capacity." (AR at 434.)

While the evidence of record indicates plaintiff has pain sitting or standing for extended periods, that evidence also supports a finding that plaintiff could perform a job in which he were provided a sit/stand option throughout the day. The only evidence arguably contrary to such a conclusion is Dr. Farmer's opinion that plaintiff should not sit or stand for prolonged periods. However, there is a lengthy history of medical records reflecting opinions that plaintiff is not so limited. Moreover, even Dr. Farmer suggested that plaintiff would eventually return to work.[13] Indeed, treating physician Dr. Buckman and Dr. Alegre both unequivocally stated that they expected plaintiff to return to work. Dr. Buckman had the longest and most extensive record of evaluating plaintiff and was the first doctor to actually evaluate him following his back injury. There is nothing to suggest any bias on the part of Dr. Buckman other than perhaps a referral to him by the worker's compensation claim administrator. (AR at 435.)

The court therefore concludes that plaintiff's self-assessment of his inability to perform any work is contradicted by the medical and other evidence of record. The court also finds that Vocational Analyst Kristin Peterson's occupational evaluation of plaintiff is consistent with the medical evidence. Ms. Peterson identified occupations of motor vehicle dispatcher, customer-complaint clerk, and traffic clerk which were all of qualified availability, are all jobs primarily performed at a desk and typically are able to accommodate ergonomic seating and adjustable

/////

---

[13] Specifically, on August 29, 2013, although plaintiff himself indicated that he did not expect to return to work, his treating physician at the VA, Dr. Farmer, answered the question "When do you anticipate this individual can return to work" with "12 mos- then review." (AR at 199.)

sit/stand option work stations which would accommodate plaintiff's recognized limitations.  (AR at 747–51.)

Accordingly, the court also concludes that in light of the evidence of record the Plan administrator was justified in denying plaintiff long term disability benefits during the "Any Occupation" period under the Plan.

**CONCLUSION**

For all of the reasons set forth above:

1) The court finds that defendant Standard Insurance Company is entitled to judgment in its favor; and

2) The Clerk of the Court is directed to enter judgment in favor of defendant Standard Insurance Company and to close this case.

IT IS SO ORDERED.

Dated:   **April 18, 2017**

_____
UNITED STATES DISTRICT JUDGE